UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SUZANNE KITTLE,<br><br>    Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 19-13076<br><br>Honorable Laurie J. Michelson |

**OPINION AND ORDER DENYING SANCTIONS AND
GRANTING SUMMARY JUDGMENT [21]**

Suzanne Kittle is suing the United States for injuries she allegedly sustained when an on-duty U.S. postal worker backed his vehicle into her parked truck. Kittle says that the accident injured her neck and impacted her ability to use her shoulders, arms, hands, and back in daily life activities. In response, the Government argues that Kittle repeatedly lied under oath about pre-existing injuries to her neck and body in an attempt to "shakedown . . . the United States." So the Government asks this Court to use its inherent powers to dismiss this case as a sanction for the false testimony. In the alternative, the Government seeks summary judgment because the U.S. Postal Service vehicle only "gently tap[ped]" Kittle's truck and so could not have caused a serious impairment of body function, as required by Michigan's No-Fault Act.

For the following reasons, this Court denies the Government's request to dismiss pursuant to its inherent powers but grants the motion for summary judgment on the merits.

## I. Background

Given video evidence of the accident and Kittle's extensive medical records, few facts can be reasonably disputed. But because the Government seeks dismissal or, in the alternative, summary judgment, the Court accepts as true Kittle's version of events where facts are disputed. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

### A. The Accident

The parties agree—and video evidence confirms—that a USPS vehicle backed into Kittle's parked truck on July 17, 2017. (ECF No. 1, PageID.3; ECF No. 21, PageID.95; ECF No. 23, PageID.762[1] (video at 10:22:03).) Kittle was seated in the driver's seat and her friend and roommate, Toby Bersine, was in the passenger seat. (ECF No. 21, PageID.96; ECF No. 27, PageID.784.) The USPS vehicle was, in Kittle's words, "not going fast" when it hit her truck. (ECF No. 27, PageID.784.) In fact, the Government's expert report states that the USPS vehicle was traveling no more than two miles per hour when it struck Kittle's truck, "slower than the speed pedestrians in the video were walking." (ECF No. 29, PageID.1112; ECF No. 21-9, PageID.727.) The video supports the expert's opinion that the USPS vehicle was backing up very

---

[1] Video on file with the Court.

slowly when it hit Kittle's truck. (ECF No. 23, PageID.762 (video at 10:22:03).) Kittle and the U.S. postal worker drove away from the scene without calling for an ambulance or law enforcement. (ECF 21-2, PageID.237–241; ECF No. 21, PageID.107.)

Despite the general agreement on what happened during the accident, the parties strenuously disagree about Kittle's health and ability to perform and engage in normal life activities before and after the accident.

### B. Kittle's Pre-Accident Health

Kittle's deposition testimony—at least before being confronted with her medical records—suggests that she was reasonably strong and healthy before the accident. (*See* ECF No. 21-2, PageID.146–157.) She denied having any injuries to her neck, except for a long-healed injury from 1985. (ECF No. 21-2, PageID.151–154 (answering "[n]o, none at all" in response to whether she had any neck issues between when she was treated for the injury in 1985 and the 2017 accident giving rise to this lawsuit).) Similarly, Kittle testified that she had no problems with her back, arms, or hands prior to the accident, except for a long-healed broken wrist in 2002. (*Id.* at PageID.146, 152.) In a state court deposition,[2] Kittle also denied having any neck, arm, or back problems before the accident. (ECF No. 21-5, PageID.612.)

---

[2] Kittle filed a "first-party claim" against State Farm Automobile Insurance Company in Michigan state court based on the same accident. *See Kittle v. State Farm*, No. 2018-8134-NF (Mich. 3rd Cir. 2018).

3

And Kittle initially testified that she was self-sufficient prior to the accident. (ECF No. 21-2, PageID.339.) She agreed that she "essentially did not need assistance with activities of daily living before the car accident." (*Id.*)

But Kittle's uncontested medical records tell a different story. (ECF No. 27, PageID.790 (acknowledging that "in nearly all cases . . . [Kittle] considered [her] treatment records to be an accurate reflection of how she felt at that time").) They demonstrate a history of issues with each of the above-referenced body parts. And documents supporting her receipt of Social Security Disability Insurance (SSDI) benefits for the 18 years prior to the accident show that Kittle also had a history of difficulty with her activities of daily living. (ECF No. 21-6, PageID.714–715 (acknowledging in her SSDI renewal form in 2014 that "physical activity has become almost impossible for me . . . [M]y days consist of me sitting and trying to do as little as possible so I don't hurt so much").)

Because Kittle's medical records are so extensive (she is also a bone cancer survivor), the Court will provide only a brief sketch.

In 2009, Kittle underwent a CT scan and was diagnosed with "[d]egenerative joint disease with congenital deformity" in her spine. (ECF No. 21-6, PageID.673.) At that time, she reported that her lower back "goes numb and tingles with pain." (*Id.* at PageID.673.) The CT scan revealed "[m]ultiple minimally bulging discs." (*Id.* at PageID.674.) When shown these medical records during her deposition, Kittle first said she could not remember the hospital visit, but later said that the doctor

4

"diagnosed [her] improperly" and that she was only treated for poison ivy at that time. (ECF No. 21-2, PageID.158–163.)

In 2012, Kittle was rear-ended in Hartland, Michigan. (*Id.* at PageID.142.) At her deposition, Kittle denied being injured in that accident and denied seeking medical treatment afterward. (*Id.* at PageID.143–144.) But hospital records show that after the accident, she went to urgent care due to neck pain, shoulder pain, and upper back pain. (ECF No. 21-6, PageID.676.) Kittle was placed in a C-collar, diagnosed with a rotator cuff injury and neck strain, prescribed Norco for pain, and advised to follow up with an orthopedic surgeon. (*Id.*) When shown these hospital records at her deposition, Kittle denied that there was anything wrong with her neck and did not remember going to the hospital. (ECF No. 21-2, PageID.165, 168.)

On June 19, 2012, Kittle saw her primary care physician, Dr. Al-Matchy, and complained about shoulder pain after she fell in a ditch. She confided that she felt like she was "falling apart" and "always hurting." (ECF No. 21-6, PageID.678.) She reported that the pain in her shoulders was so severe that it interfered with her daily life activities. (*Id.*) In her deposition, Kittle did not remember falling in a ditch or seeking medical attention for shoulder pain. (ECF No. 21-2, PageID.173–175.)

In August 2012, Kittle filled out a lower back and spine questionnaire provided to her by her doctor. She rated her back pain a 7 out of 10 and her leg pain a 9 out of 10. (ECF No. 21-6, PageID.681.) Kittle did not dispute this evidence at her deposition. (ECF No. 21-2, PageID.184–185.)

5

In September 2012, Kittle saw an orthopedic spine surgeon, complaining of "pain in her back with radicular symptoms down her right leg." (ECF No. 21-6, PageID.683.) An MRI of her spine showed disc bulges at L3-L4 and L4-L5. (*Id.*) Later that same month, Kittle saw a pain specialist. She rated her pain an 8 out of 10 and complained that her shoulder was "giving her the most difficulty." (*Id.* at PageID.685.) Kittle did not dispute any of this evidence at her deposition. (ECF No. 21-2, PageID.185–187.)

In October 2012, Kittle saw an orthopedic surgeon who found that she had "significant back issues" as well as "shoulder problems." (ECF No. 21-6, PageID.689.) The surgeon believed that she was a good candidate for rotator cuff surgery. (*Id.*) She appears to have had that surgery in October 2012. (*Id.* at PageID.690.)

In July 2013, Kittle complained to Dr. Al-Matchy about pain in her right shoulder after her rotator cuff surgery. (ECF No. 21-6, PageID.695.) She again complained of continuing lower back pain, difficulty walking, and pain that affected her daily activities. (*Id.*)

In February 2015, Kittle complained to her physician that she was having difficulty lifting and gripping things using her hands. (*Id.* at PageID.703.) Kittle did not dispute this evidence at her deposition. (ECF No. 21-2, PageID.211.)

On May 30, 2017—just two months before the accident—Kittle complained to Dr. Al-Matchy of "long time" arm pain. (ECF No. 21-6, PageID.706.) Again, Kittle acknowledged and did not dispute this evidence at her deposition. (ECF No. 21-2, PageID.214.)

But at her final doctor's appointment before the accident, in June 2017, Kittle rightly points out that she did not complain of neck pain or any other relevant conditions. (ECF No. 27, PageID.786 (citing ECF No. 27, PageID.943).)

As mentioned, well before and throughout the time period detailed above, Kittle received social security disability benefits. (ECF No. 21-6, PageID.708; ECF No. 27, PageID.782.) To continue receiving benefits, Kittle periodically submitted Continuing Disability Review Reports to the Social Security Administration (SSA). (ECF No. 21-2, PageID.335.) As part of the latest Report before the accident, she represented that—at least as of 2014—she needed help dressing, bathing, caring for her hair, preparing meals, doing chores, driving or taking public transit, walking, standing, lifting heavy weights, and using her arms, hands, and fingers. (ECF No. 21-6, PageID.714.) At that time, Kittle was also informed of her responsibility to report any changes in her disability—including if her "medical condition improve[d]"—to the SSA in short order. (ECF No. 29-4, PageID.1128.) Kittle did not dispute this evidence at her deposition but explained that "the pain [was] different" before the accident. (ECF No. 21-2, PageID.349.)

### C. Kittle's Post-Accident Health

Kittle says that, even though the USPS vehicle was backing up at a very slow speed, she "reacted to the impact by turning and jerking, because she did not see it coming, nor was she able to anticipate it." (ECF No. 27, PageID.784.) Kittle admits that "for a few hours" after driving herself home from the accident she did not think she was injured. (ECF No. 21-2, PageID.235.)

7

Later that evening, however, Kittle experienced "burning in the back of [her] neck" and left arm pain. (*Id.* at PageID.225.) So she went to the hospital. (*Id.* at PageID.241.)

Kittle was diagnosed with whiplash, which "shocked" her because "at the time [she] didn't feel anything." (*Id.* at PageID.244.) Kittle was also diagnosed with acute cervical strain, paresthesia, and muscle spasms. (ECF No. 27, PageID.965.) At the hospital, Kittle denied having numbness or tingling in her arms and the range of motion in her neck was not restricted. (*Id.* at PageID.963.) No MRI was performed at that time, but a CT scan of her spine was "negative." (*Id.* at PageID.786.)

A week later, Kittle saw Dr. Al-Matchy for an appointment that had been scheduled before the accident. (ECF No. 21-2, PageID.290.) She complained of neck and shoulder pain, which she attributed to the accident, and Dr. Al-Matchy referred her to a physical therapist. (ECF No. 27, PageID.982–984.) She attended physical therapy from July 31, 2017 through March 15, 2018. (*Id.* at PageID.988–992.)

Kittle was also treated by a pain management physician. Medical records from the initial appointment show that Kittle presented with headaches, neck pain, upper arm pain, shoulder pain, and back pain, all of which she attributed to the accident. (ECF No. 27, PageID.993.) Between December 2017 and November 2018, the pain doctor issued several disability certificates for Kittle, disabling her "from housework, driving, and recreational activities." (*Id.* at PageID.787, 1021–1032.) Though the disability certificates nominally attribute the injury to the car accident, they do not explain any basis for the connection. (*See, e.g., id.* at PageID.1021.) When asked at

8

her deposition how she knew these symptoms were related to the accident, Kittle could only say she "never had them before the car accident." (ECF No. 21-2, PageID.302.)

Three months after the accident, Kittle had an MRI, which revealed a "broad-based herniated disc at C6-C7," and other tests, which revealed "radiculopathy - the pinching of the nerve root at the spinal column, at the same vertebrae as the herniation." (ECF No. 27, PageID.798–799.) After the pain did not resolve with conservative treatment, she underwent spinal fusion surgery on June 14, 2019. (*Id.* at PageID.788.)

Kittle claims that the accident affected her ability to garden, cook, foster kittens, and clean her apartment, primarily because of reduced arm and upper body strength. (*Id.* at PageID.800.) However, Kittle's longtime roommate, Toby Bersine, who "sees things [in their apartment] on a daily basis," testified that Kittle's daily activities "were pretty much the same" after the accident. (ECF No. 21-3, PageID.409, 459.)

As part of this litigation, the Government hired two expert witnesses to independently evaluate Kittle's medical condition. Dr. Christopher Shoenherr found that Kittle "did not sustain any permanent or temporary impairment" as a result of the 2017 accident and that "there [are] no objective findings and only subjective complaints of pain.'" (ECF No. 21-12, PageID.741.) After reviewing video of the accident, Dr. Shoenherr filed an addendum stating that "it would be unlikely that any injury, even a minor one[,] would result from this impact." (ECF No. 21-13,

9

PageID.744.) According to Dr. Shoenherr, "it is probable that no injury resulted from this incident, and any complaints of pain or numbness Ms. Kittle may have had were likely premorbid and not related to the accident in question." (*Id.*) The second expert, Dr. Phillip Friedman, also found that it was unlikely that Kittle's injuries resulted from the crash, but he could not "exclude some exacerbation as a result of the motor vehicle accident." (ECF No. 21-14, PageID.760.) Both experts found that imaging taken after the accident contained evidence of pre-morbid injuries. (*Id.* at PageID.759; ECF No. 21-12, PageID.740.)

### D. Procedural History

On October 19, 2019, Kittle filed this action against the United States Postal Service and the United States of America based on a theory of vicarious liability, asserting a single claim for negligence under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.* (ECF No. 1, PageID.3.) On March 23, 2020, the parties stipulated to dismiss the United States Postal Service as a defendant. (ECF No. 12.)

In May 2021, the Government filed a motion to dismiss pursuant to this Court's inherent powers because of Kittle's allegedly false testimony or, in the alternative, for summary judgment. (ECF No. 21.) Given the clear briefing and record, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Analysis

The Court begins with the Government's motion to dismiss pursuant to this Court's inherent authority and then examines the Government's motion for summary judgment.

### A. Sanctions

The Sixth Circuit applies a four-factor test to determine whether dismissal is an appropriate sanction for party or counsel misbehavior. The factors include: "(1) Whether the party's [conduct was] due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered." *United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002) *see also Coleman v. American Red Cross*, 23 F.3d 1091, 1094 n.1 (6th Cir. 1994) (noting "that the factors considered when reviewing a dismissal under Rule 41(b), Rule 37(b), or a court's inherent power are largely the same"). Under the test, "no one factor is dispositive, [but] dismissal is proper if the record demonstrates delay or contumacious conduct." *Reyes*, 307 F.3d at 458.

Though the Government does not explicitly reference the *Reyes* factors, its argument for dismissal is largely based on the first factor, and it cites several incidents that it claims show willfulness, bad faith, or fault by Kittle.

For her part, Kittle says the Government "mischaracterized" her testimony, that she answered questions to the best of her ability given how frequently she visited the doctor, and that she acknowledged her prior medical history repeatedly throughout her testimony. (ECF No. 27, PageID.790–794.)

The Court is hard-pressed to disagree with the Government that Kittle's medical records blatantly contradict her testimony in several respects and that she

11

altered her testimony only after being shown the records. *See Black v. Suzuki Motor Corp.*, No. 04-CV-180, 2008 WL 2278663, at *3 (E.D. Tenn. May 20, 2008) (dismissing a plaintiff's case after he "deliberately misrepresented his cause of action . . . lied under oath about the circumstances surrounding his accident . . . [and] convinced others to offer false testimony . . . in their depositions"). For example, prior to being shown medical records, Kittle testified that she had no issues with her neck, back, arms, and hands before the accident. (ECF No. 21, PageID.115.) But between 2012 and 2014, Kittle complained repeatedly—on at least ten occasions—that she suffered from back pain. (ECF No. 21-6, PageID.676–681, 684, 691, 693, 695, 697, 701.) She also repeatedly complained of pain, numbness, and heaviness in her hands, as well as pain in her arms, hands, and shoulders. (*See, e.g.,* ECF No. 21-6, PageID.679–680, 691, 693, 703, 706.) As another example, the Government suggests that Kittle falsely testified that she was not injured in a 2012 car accident. When first asked, she testified definitively that she did not receive medical treatment following the accident. (See ECF No. 21-2, PageID.143–144 ("Q. Were you injured in that accident? A. No, not at all. Q. Did you seek medical treatment as a result of that accident? A. No.").) But after being shown the medical records, she changed her testimony and said that she simply did not remember seeking treatment. (ECF No. 21-2, PageID.165, 168.) As a third example, the Government argues that Kittle lied when she testified that she was self-sufficient in her daily life activities prior to the accident. (ECF No. 21, PageID.116.) After all, Kittle has received SSDI benefits for

the last 18 years and did not inform the SSA of any improvement in her condition despite being required to do so. (ECF No. 29-4, PageID.1128.)[3]

Ultimately, though, the Court need not decide whether Kittle simply had faulty memory and too many medical visits for accurate recall or whether she willfully offered false testimony because the remaining *Reyes* factors are not satisfied.

Under the second factor, the Court considers "whether the adversary was prejudiced by the . . . party's conduct." *Reyes*, 307 F.3d at 457. A party is prejudiced if it unnecessarily wasted its time, resources, and effort. *See Vaughan v. Brigham*, No. 3:10-05-DCR, 2011 WL 2633369, at *5 (E.D. Ky. July 5, 2011) (finding that the plaintiff's conduct prejudiced a third-party who was forced to "expend[] significant resources . . . [and] who [was] dragged into court on multiple occasions to respond to a suit to which it [was] not a party."). As the Government was aware of Kittle's medical records prior to her deposition, it is unlikely that her testimony unfairly prejudiced them. Indeed, the deposition transcript reveals that the Government was more than prepared to impeach Kittle on the inconsistencies.

Under the third factor, the Court considers "whether the . . . party was warned that failure to cooperate could lead to dismissal." *Reyes*, 307 F.3d at 458. "Generally, the absence of prior warnings that dismissal could result from a party's continued

---

[3] The parties also argue about whether Kittle and Bersine solicited or accepted money from the U.S. postal worker in exchange for a promise not to summon the police to the scene of the accident. Both sides rely on the video evidence. After carefully reviewing the video, the Court concludes that it is ambiguous on this point. But because the *Reyes* factors are not satisfied, the Court need not weigh into the debate here.

13

misconduct weighs against dismissal." *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 512 (N.D. Ohio Mar. 11, 2013) (citing *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 367 (6th Cir. 1997)) (internal citations omitted). Here, the Court was not advised about any improper litigation conduct prior to the dispositive motion practice and thus, has not given Kittle any prior warnings about sanctions. So this factor is not satisfied.

Similarly, under the fourth factor, the Court considers "whether less drastic sanctions were imposed or considered before dismissal was ordered." *Reyes*, 307 F.3d at 458. Dismissal is appropriate when "lesser sanctions were imposed for earlier discovery violations and anything less than dismissal would be futile." *Fharmacy Records v. Nassar*, 379 Fed. App'x 522, 527 (6th Cir. 2010). Here, no less drastic sanctions were imposed or even considered. This factor is not satisfied.

For these reasons, the Court will deny the Government's motion to dismiss pursuant to the Court's inherent authority.

### B. Summary Judgment

#### 1. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). To establish a genuine issue of material fact, "the mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## 2. Federal Tort Claims Act

Under the FTCA, a plaintiff may recover monetary damages from the United States for injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope . . . of employment." 28 U.S.C. § 1346(b)(1). The law of the state where the act or omission occurred governs the claim. *Id.* Here, the parties agree that the applicable law is Michigan's No-Fault Act, Mich. Comp. Laws § 550.3101 *et seq.* (ECF No. 21, PageID.117; ECF No. 27, PageID.794.)

Michigan's No-Fault Act "abolished tort liability arising from the use of a motor vehicle in Michigan," with limited exceptions. *Ljuljdjuraj v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 908, 913 (6th Cir. 2014). One such exception—which forms the basis of Kittle's claim—allows recovery for non-economic loss when an injured party "has suffered . . . serious impairment of body function." *Lopez-Garcia v. United States*, 207 F. Supp. 573, 758 (E.D. Mich. 2016) (quoting Mich. Comp. Laws § 500.3135(1)).

Under the governing statute, the issue of whether an injured person has suffered serious impairment of body function is a question of law for the court if it finds either of the following: "(i) There is no factual dispute concerning the nature and extent of the person's injuries. (ii) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body

15

function[.]" Mich. Comp. Laws § 500.3135(2)(a)(i–ii). In other words, "[u]nder the plain language of the statute, the threshold question whether the person has suffered a serious impairment of body function should be determined by the court as a matter of law as long as there is no factual dispute regarding 'the nature and extent of the person's injuries' that is material to determining whether the threshold standard is met." *McCormick v. Carrier*, 795 N.W.2d 517, 525 (Mich. 2010).

Here, there is no material factual dispute over the nature and extent of Kittle's injuries. First, neither party argues that this is in dispute. Second, the parties agree that Kittle was treated for neck, back, shoulder, arm, and hand pain following the accident. *See McCormick*, 795 N.W.2d at 538 (finding no factual dispute when "[t]he parties do not dispute that plaintiff suffered a broken ankle, was completely restricted from bearing weight on his ankle for a month, and underwent two surgeries over a 10–month period and multiple months of physical therapy"). To the extent there are contested factual issues between the parties, these issues are not material to the threshold question of whether Kittle suffered a "serious impairment of body function." So the Court will proceed to the merits.

To prove that she suffered a "serious impairment of body function," Kittle must show: "(1) an objectively manifested impairment (2) of an important body function that (3) affects [her] general ability to lead . . . her normal life." *McCormick*, 795 N.W.2d at 526; *see also* Mich. Comp. Laws § 500.3135(5). Because Kittle cannot clear even the first hurdle, her claim fails.

16

To prove that she has suffered an objectively manifested impairment, Kittle "must show that the injuries *resulting from the accident* were 'evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function.'" *Lopez-Garcia*, 207 F. Supp. 3d at 758 (quoting *McCormick*, 795 N.W. at 527). In other words, Kittle must demonstrate "a causal relationship between [her] injury and the accident." *Id.* at 759. "[S]howing an impairment generally requires medical testimony." *Id.* And "a general reference [to medical records], without some facially apparent connection to the underlying trauma—or an expert opinion establishing same—is not enough." *Id.* (finding no objectively manifested impairment where plaintiff provided medical imaging showing bulging discs but no connection to the underlying trauma); *see also Mehdi v. Gardner*, No. 319630, 2015 WL 1227710, at *2 (Mich. Ct. App. Mar. 17, 2015) (finding no objectively manifested impairment where plaintiff provided MRIs and a nerve conduction study performed after the accident but "presented no evidence linking his conditions to the vehicle accident").

Kittle claims that the accident injured her neck and impaired her ability to use her arms and hands to garden, cook, foster kittens, and clean her apartment, primarily because of reduced arm and upper body strength. (ECF No. 27, Page.ID 800–801.)

But the Government argues that Kittle has failed to show a causal relationship between the accident and this alleged impairment, especially in light of her extensive medical history. It points out that she did not call the police to the scene of the

17

accident, did not know she was injured until hours after the accident, that the CT scan on the day of the accident was negative, and that both of its experts concluded that "imaging conducted after the accident shows no traumatic injury." (ECF No. 21, PageID.118; ECF No. 29, PageID.1117.)

In response, Kittle points to three sets of medical records: the records from the emergency room on the day of the accident, the records from her visit with Dr. Al-Matchy seven days after the accident, and the records from her pain management doctor who issued several disability certificates. (ECF No. 27, PageID.797.) She continues: "three separate physicians state in their records that they have identified objectively manifested impairments related to the accident." (ECF No. 27, PageID.798.) And, Kittle argues, an MRI conducted three months after the accident revealed a herniated disk and radiculopathy.

Kittle's evidence would not permit a reasonable jury to find that the accident caused her impairment. References to medical records are not enough unless, on their face, they make apparent the connection to the underlying trauma. *See Lopez-Garcia*, 207 F. Supp. 3d at 759. And the records Kittle cites only reference the accident without providing any explanation of how (or whether) the accident caused the impairments. (*See, e.g.,* ECF No. 27, PageID.1021 ("I have examined and/or treated the above-named patient for injuries sustained in the above accident.").) And because the medical records that Kittle relies on reference impairments that are very similar to undisputed pre-accident impairments (such as back pain and arm weakness), she

needs something more than a passing reference to the accident to establish that the accident caused an objectively manifested impairment.

And the MRI is also insufficient. "That a condition temporally follows an event is not in itself evidence of causation." *Mehdi*, 2015 WL 1227710, at *2 (citing *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 472–73 (Mich. 2003)). In other words, Kittle "provides no evidence that the conditions identified in the MRI were caused by the motor vehicle accident." *See Coleman v. Metro. Grp. Prop. & Ins. Co.*, No. 18-12030, 2019 WL 3288930, at *8 (E.D. Mich. July 22, 2019). Kittle suffered from herniated and bulging disks prior to the accident, and so without some causation evidence or expert testimony, there is no basis to reasonably infer that the herniation three months after the accident was attributable to the accident.

Finally, Kittle's failure to address the Government's expert witnesses precludes her claim. (ECF No. 21-13, PageID.744; ECF No. 21-14, PageID.760.) By failing to counter that evidence it is treated as "undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). And it shows no impairment that can be linked to the July 2017 accident. *See Kelly v. United States*, No. 18-CV-11949, 2019 WL 5684375, at *3 (E.D. Mich. Oct. 31, 2019). (It is worth noting that while the experts acknowledge Kittle's pre-existing conditions, she is not making any claim about exacerbation of these conditions.)

In sum, Kittle has presented insufficient evidence of an objectively manifested impairment caused by the accident. And Kittle's failure to produce medical evidence connecting her impairment to the accident "is especially significant in light of her

19

extensive medical history" involving the same areas of the body and similar pre-accident impairments. *See McClinton v. Hartwell*, No. 352687, 2021 WL 1050357, at *2 (Mich. Ct. App. Mar. 18, 2021). "Some expert medical testimony is needed to create a triable issue of cause on such a record. The jury is not allowed to speculate as to whether the [July 2017] accident is the cause of Plaintiff's pain when the treaters themselves have not made the link as part of their treatment." *See Alexander v. United States*, No. 1:18-CV-1381, 2020 WL 3429828, at *13 (W.D. Mich. Apr. 6, 2020). So Kittle fails to satisfy the first *McCormick* prong. And because she cannot satisfy this requirement, the Government is entitled to summary judgment and the Court need not address the other elements.

### III. Conclusion

For the reasons stated, the Government's motion for sanctions is DENIED and its motion for summary judgment is GRANTED.

SO ORDERED.

Dated: December 2, 2021

> s/Laurie J. Michelson
> LAURIE J. MICHELSON
> UNITED STATES DISTRICT JUDGE

20